J-S53031-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: S.L.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.L.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1189 EDA 2019 |

Appeal from the Decree Entered March 25, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0001245-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: H.M.M, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.L.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1190 EDA 2019 |

Appeal from the Decree Entered March 25, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0001247-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: A.G.I., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.L.R, MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1191 EDA 2019 |

Appeal from the Decree Entered March 25, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0001246-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: A.G.I, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.L.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1192 EDA 2019 |

Appeal from the Decree Entered March 25, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0001248-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: S.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.L.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1440 EDA 2019 |

Appeal from the Order Entered March 25, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  51-FN-472483-2009,
CP-51-DP-0052743-2010

| | | |
|---|---|---|
| IN THE INTEREST OF: A.I., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: N.L.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1441 EDA 2019 |

Appeal from the Order Entered March 25, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  51-FN-472483-2009,
CP-51-DP-0002389-2016

J-S53031-19

<table>
<tr><td>IN THE INTEREST OF: H.M.M., A<br>MINOR</td><td>:</td><td>IN THE SUPERIOR COURT OF<br>PENNSYLVANIA</td></tr>
<tr><td></td><td>:<br>:<br>:</td><td></td></tr>
<tr><td>APPEAL OF: N.L.R., MOTHER</td><td>:</td><td></td></tr>
<tr><td></td><td>:<br>:<br>:<br>:</td><td></td></tr>
<tr><td></td><td>:</td><td>No. 1442 EDA 2019</td></tr>
</table>

Appeal from the Order Entered March 25, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  51-FN-472483-2009,
CP-51-DP-0002700-2016

<table>
<tr><td>IN THE INTEREST OF: A.I., A MINOR</td><td>:</td><td>IN THE SUPERIOR COURT OF<br>PENNSYLVANIA</td></tr>
<tr><td></td><td>:<br>:</td><td></td></tr>
<tr><td>APPEAL OF: N.L.R., MOTHER</td><td>:</td><td></td></tr>
<tr><td></td><td>:<br>:<br>:<br>:<br>:</td><td></td></tr>
<tr><td></td><td>:</td><td>No. 1443 EDA 2019</td></tr>
</table>

Appeal from the Order Entered March 25, 2019
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  51-FN-472483-2009,
CP-51-DP-0002388-2016

BEFORE:  OLSON, J., STABILE, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED DECEMBER 04, 2019**

N.L.R. (Mother) files these consolidated appeals from the decrees granting the petitions of the Philadelphia Department of Human Services (DHS) and involuntarily terminating her parental rights to S.L.C., born in August 2009, H.M.M., born in October 2011, A.G.I., born in February 2014, and Au.G.I., born in March 2015 (collectively, Children), pursuant to 23

- 3 -

Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[1]  Mother further appeals from the orders changing Children's permanent placement goals to adoption pursuant to 42 Pa.C.S. § 6351.  We affirm.

The record reveals the following background.  Mother had two older children, D.M.M. and L.L.C. (collectively, the older children), in addition to Children.  Mother first came to the attention of DHS in June 2010 after reports that a cousin had sexually assaulted one of the older children.  N.T., 3/25/19, at 68-69; DHS Ex. 7, General Protective Services (GPS) Report, 5/24/10.  In November 2010, Mother requested that DHS place the older children and S.L.C. in care because she could not find housing.  App. for Order of Protective Custody, 11/23/10.  Accordingly, the older children and S.L.C. entered DHS's care in November 2010.  Master's Recommendation for Shelter Care and Order, 11/26/10; Dependency Pet., 11/30/10, at ¶ f.

In May 2013, the trial court returned the older children and S.L.C. to Mother's care.  Master's Recommendation and Order, 5/2/13; N.T., 3/25/19, at 120.  The court-ordered supervision of the family ended in October 2013.  Master's Recommendation-Termination of Ct. Supervision and Order, 10/31/13.

---

[1] The court also terminated the parental rights of G.I., the father of A.G.I. and Au.G.I., R.C., Jr., the father of S.L.C., and R.M., the father of H.M.M.  Further, the court terminated the parental rights of any unknown putative father.  The fathers or putative fathers of Children have not filed appeals or participated in the present appeal.

Thereafter, DHS received a report in January 2015 alleging that one of the older children had recurrent head lice. In April 2015, DHS received another report that both older children were truant because Mother was evicted from her own home and was living in a hotel.[2] N.T., 3/25/19, at 69-72; DHS Exs. 8-9, GPS Reports, 1/26/15 and 4/8/15. In May 2015, in-home services were implemented for the family.

In October 2016, DHS received another report alleging that Mother left Children and the older children with family members, including her mother (Maternal Grandmother), but the family members could no longer care for them. DHS Ex. 10, GPS Report, 10/18/16. DHS began committing Children to its care.[3]

The trial court adjudicated Children and the older children dependent between October 2016 and January 2017.[4] DHS implemented a single case plan (SCP) with objectives for Mother to (1) attend team meetings, (2) appear for random drug screens, (3) attend a dual diagnosis assessment and a parenting capacity evaluation (PCE), (4) comply with mental health treatment,

_____

[2] The record also contains a GPS report received on February 10, 2014, alleging that A.G.I. was born with withdrawal symptoms and Mother acknowledged taking Percocet and Tylenol with codeine. GPS Report, 2/10/14.

[3] The older children reported that they were physically abused by Mother, and Mother threatened to kill them if they discussed the abuse. *Id.*

[4] DHS was unable to locate all of Mother's children at one time. Therefore, the trial court adjudicated the older children and S.L.C. in October 2016, A.G.I. and Au.G.I. in November 2016, and H.M.M. in January 2017.

and (5) find stable housing. N.T., 3/25/19, at 71-73. While Mother was compliant with some of her goals, she did not appear for random drug screens or find appropriate housing, and she inconsistently participated in mental health treatment. *Id.* at 73, 79-80. Mother initially missed PCE interviews, but then appeared for an interview with William Russell, Ph.D., on October 28, 2017.

On December 26, 2017, DHS filed petitions to terminate Mother's parental rights to Children and to change Children's permanent placement goals to adoption.[5] On February 13, 2018, Dr. Russell issued his report regarding Mother's PCE, opining that Mother could not provide permanency and safety for Children.

On March 25, 2019, the trial court conducted a hearing on the petitions.[6] DHS presented the testimony of Dr. Russell; Tawanda Parker, a Community

---

[5] DHS apparently filed petitions to change the permanency goals and terminate Mother's parental rights for all six of her children. However, at the hearing, counsel for DHS stated that it would hold in abeyance the petitions regarding the older children to consider goals of permanent legal custody. N.T., 3/25/19, at 16.

[6] At the hearing, Children had the benefit of legal counsel, Attorney Mario D'Adamo, III, as well as a guardian *ad litem*, Attorney Athena Dooley. **See In re Adoption of L.B.M.**, 161 A.3d 172, 174-75, 180 (Pa. 2017) (plurality); **see also In re T.S.**, 192 A.3d 1080, 1089-90, 1092-93 (Pa. 2018) (reaffirming the ability of an attorney-guardian *ad litem* to serve a dual role and represent a child's non-conflicting best interests and legal interests), *cert. denied*, 139 S. Ct. 1187 (2019); **In re Adoption of K.M.G.**, ___ A.3d ___, ___, 2019 PA Super 281, 2019 WL 4392506, at *4 (Pa. Super. filed Sept. 13, 2019) (*en banc*) (holding that this Court may raise *sua sponte* the issue of whether the trial court failed to appoint any counsel for the Child in a

Umbrella Agency (CUA) case manager; Marsha Rosario, a CUA case aide; and B.J.F. (Foster Mother), Children's foster parent. Additionally, the trial court interviewed Children *in camera*.

Mother, who was represented by counsel, also testified at the hearing. Mother described her history with DHS, how Children came into care, and her progress toward her SCP goals. Mother asserted that between 2010 and 2013, she asked DHS to place her older children and S.L.C. in care after she and Maternal Grandmother had an argument. *Id.* at 118-21. With respect to the events in October 2016, Mother stated that she travelled to Atlanta because she was looking to move her family there. *Id.* at 111-12. While she was gone, Mother left Children with Maternal Grandmother, but stayed in contact with Children. *Id.* Mother claimed that it was Maternal Grandmother's idea that she go to Atlanta without Children, she was away for one month, and she did not intend to abandon Children. *Id.* at 110-13.

With respect to her SCP goals, Mother testified that she obtained employment, attended drug tests, and completed parenting classes. *Id.* at 114. Further, Mother testified that she regularly attended the visits with Children and appeared for her PCE. *Id.* at 115. Mother acknowledged that she failed to obtain independent housing, but blamed the landlord for not

termination hearing, but this Court may not review *sua sponte* whether a conflict existed between counsel's representation and a child's legal interests).

calling her back. *Id.* at 116-17. Nevertheless, Mother asserted that Maternal Grandmother's home was appropriate. *Id.* at 120-21.

Mother stated that she was not in mental health treatment. *Id.* at 127-29. Mother testified that she saw a therapist for six or seven months, but that her provider told her she no longer needed treatment, because "the only problem that I have is that I'm stressed out over this case, that everything just happened at once for no reason." *Id.*

Immediately following the hearing, the trial court entered the decrees involuntarily terminating Mother's parental rights to Children and the orders changing Children's placement goals to adoption.[7] On April 24, 2019, Mother, acting *pro se*, timely filed notices of appeal with respect to the decrees involuntarily terminating her parental rights to Children.[8]

---

[7] For reasons that are not clear, the decree involuntarily terminating Mother's parental rights to A.G.I. is noted on the docket but is only contained in the certified record as an attachment to Mother's *pro se* notice of appeal.

[8] Generally, hybrid representation is not permitted on appeal, but this Court is required to docket a *pro se* notice of appeal, "even in instances where the *pro se* appellant was represented by counsel in the trial court." *Commonwealth v. Williams*, 151 A.3d 621, 623 (Pa. Super. 2016) (citation and internal alterations omitted). We note that counsel for Mother submitted all subsequent filings.

We also note that Mother did not file a concise statement of errors complained of on appeal concurrently with her *pro se* notices of appeal. *See* Pa.R.A.P. 1925(a)(2)(i). However, Mother, through counsel, filed Rule 1925(b) statements on May 1, 2019. Because Mother filed her Rule 1925(b) statements one week after her notices of appeal, and there is no assertion of any prejudice, we do not quash or dismiss her appeals. *See In re K.T.E.L.*, 983 A.2d 745, 747 (Pa. Super. 2009) (holding that failure to file a Rule

Thereafter, on May 3, 2019, Mother, through counsel, filed petitions for permission to appeal the goal change orders *nunc pro tunc*. On May 6, 2019, the trial court granted the petitions and ordered Mother to file her notices of appeal within fifteen days. On May 15, 2019, Mother timely complied by filing counseled notices of appeal and concise statements of errors complained of on appeal.

Mother raises the following issues for our review:

1. The trial court erred and/or abused its discretion by entering orders on March 25, 2019, involuntarily terminating the parental rights of Mother, N.L.R. More specifically, the trial court abused its discretion as substantial, sufficient and credible evidence was presented at the time of trial which would have substantiated denying the Petition for Goal Change Termination [sic]. [DHS] has failed to meet its burden for termination by clear and convincing evidence under 23 Pa.[C.S. §] 2511 (a) (1), (2), (5) and (8).

2. The trial court erred and/or abused its discretion by terminating the parental rights of Mother . . . pursuant to 23 Pa.[C.S. §] 2511(b) where DHS failed to prove by clear and convincing evidence that involuntar[il]y terminating her parental rights best served the emotional needs and welfare of the children.

3. The trial court erred and/or abused its discretion by changing [C]hildren's goal to adoption after terminating the parental rights of Mother pursuant to 23 Pa.[C.S. §§] 2511(a)(1)[,] (2)[,] (5)[,] (8) and 2511(b) where [DHS] failed to prove by clear and convincing evidence that reunification was not a viable option.

Mother's Brief at 9.

---

1925(b) statement concurrently with a children's fast track appeal is considered a defective notice of appeal, to be disposed of on a case-by-case basis, but would not result in dismissal or quashal where there was no prejudice to the other parties as a result of the late filing).

First, Mother argues that the trial court improperly terminated her parental rights pursuant to Section 2511(a). Specifically, Mother challenges the trial court's finding that she lacked the capacity to parent. *Id.* at 32. Mother acknowledges that Dr. Russell opined that Mother could not provide permanency and safety for Children. *Id.* However, Mother observes that Dr. Russell's PCE occurred over a year before the hearing, lasted less than two hours, and did not include any direct observation of Mother's interactions with Children. *Id.* Based on the staleness of the PCE and the failure to observe Mother with Children, Mother contends that the trial court did not have clear and convincing evidence of a lack of parental capacity. *Id.*

We review Mother's claim mindful of the following principles:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we initially focus our analysis on Section 2511(a)(2), which provides as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

To satisfy the requirements of Section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements:

"(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). The grounds for termination of parental rights under Section 2511(a)(2) "are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Here, in evaluating Section 2511(a)(2), the trial court concluded that "Mother made insufficient and inconsistent efforts to meet her SCP objectives." Trial Ct. Op., 7/12/19, at 4. The trial court credited the testimony of Ms. Parker, the CUA case manager, and Dr. Russell, who conducted the PCE. *Id.* at 6; *see also* N.T., 3/25/19, at 138. The trial court determined that "[t]he record demonstrated Mother's ongoing inability to provide care for[,] or control of[,] Children[,] and Mother's failure to remedy the conditions that brought [] Children into care." Trial Ct. Op., 7/12/19, at 4.

The record supports the trial court's conclusion. As indicated above, Mother was involved with DHS dating back to 2010. Beginning in October 2016, DHS took Children into care after Mother went to Atlanta for approximately one month and left Children with family members, including Maternal Grandmother.

Ms. Parker, the CUA case manager, testified that Mother was compliant with her SCP goals, with the exception of locating stable housing and attending mental health treatment. N.T., 3/25/19, at 73. With respect to mental health treatment, Ms. Parker testified that Mother began mental health treatment in 2018, but stopped prior to the termination hearing. *Id.* at 78. Further, Mother did not attend random drug screens as required by the trial court. *Id.* at 79-80. Ms. Parker testified that Mother did not call her about Children's medical appointments or schooling and did not attend Children's medical, dental, or individualized education program appointments. *Id.* at 83-84. Moreover, Ms. Parker expressed concerns about returning Children to Mother's care because Mother was not active in mental health treatment and did not have appropriate housing. *Id.* at 91.

Dr. Russell testified that Mother minimized her involvement with DHS. *Id.* at 29. For instance, Mother suggested that her older child's allegations of sexual abuse in 2010 were a misunderstanding. *Id.* Further, Mother failed to disclose to him that DHS took her older children and S.L.C. into care between 2011 and 2013. *Id.* Additionally, Mother denied any developmental, emotional, or behavioral issues with Children, despite records indicating some of them were experiencing behavioral problems. *Id.* at 31-32. Dr. Russell noted that although records showed that A.G.I. was born with withdrawal symptoms from Percocet, Mother denied using any illicit pills. *Id.* at 39.

Dr. Russell testified that he did not believe that Mother could provide a permanent or safe environment for Children. *Id.* at 35. In support, Dr.

Russell identified Mother's difficulties understanding Children's needs, as well as Mother's role in her current situation, including her lack of housing. *Id.* at 35-36. Dr. Russell stated that Mother's general instability fed "into [C]hildren's problems and then in turn [C]hildren being removed." *Id.* at 36. Dr. Russell suggested that Mother needed to develop her own life and provide for herself adequately so that she could then do so for Children. *Id.* at 39-40. In short, Dr. Russell believed that Mother could not provide safety and stability for Children unless she demonstrated an insight into the reasons that Children were placed in care, and Mother's issues would continue if Mother did not obtain treatment. *Id.* at 36, 41-42.

Upon cross-examination by Mother's counsel, Dr. Russell denied that Mother's lack of capacity to parent was primarily due to financial issues. Dr. Russell testified as follows:

> I think all of the aspects of what I described go into that decision. When I come to the conclusion where my professional opinion is that there's a question of safety it's predicated upon the totality of the circumstances. And in this case the insight, the understanding of the parent is very important because it has to do with her history of behavior, her current and her future functioning. That I recommended individual therapy to help address that, that was part of it. That she needed to get housing, that would be part of it. That she would need income, that goes with you can't get housing without income. So those issues are just as important as the other issues of learning [] what's going on with your children. Go to the therapy sessions, go and find out what's going on with each of them. So I don't think any one issue overrode the others.

*Id.* at 45-46.

Our review reveals that the record supports the trial court's conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused Children to be without essential parental control or subsistence necessary for their physical and mental well-being. *See M.E.P.*, 825 A.2d at 1272. Mother's arguments, which focus on the facts that Dr. Russell conducted the PCE one year before the hearing and that Dr. Russell did not personally observe Mother's interactions with Children, go to the weight afforded to Dr. Russell's testimony. Moreover, the trial court had ample opportunity to observe all of the witnesses and consider all of the evidence. Under these circumstances, this Court must defer to the trial court's findings that are supported by the record. *See T.S.M.*, 71 A.3d at 267. Therefore, we have no basis to disturb the trial court's decision to terminate Mother's parental rights to Children pursuant to Section 2511(a)(2). *See id.*

In her second issue, Mother asserts that the trial court abused its discretion with respect to Section 2511(b). Mother contends she made efforts to maintain a bond with Children by engaging in weekly supervised visits. Mother highlights the testimony of Ms. Rosario, the CUA case aide, that Mother was "consistent with her visits[,] which she characterized as successful." Mother's Brief at 34. Mother contends that Ms. Rosario's testimony contradicts Foster Mother's testimony describing the Children's bond with Mother as a "friend bond." *Id.* at 34-35. Mother claims that because the trial court found "Ms. Rosario's testimony to be credible and afforded her testimony great

weight, [DHS] did not meet their burden by proving by clear and convincing evidence that severing Mother's parental rights would best serve the developmental, physical and emotional needs of the Children." *Id.* at 35. Further, Mother observes that Children expressed a desire to return to her. *Id.*

Additionally, Mother notes that DHS refused her request to reevaluate Maternal Grandmother's home shortly before the hearing. According to Mother, that refusal prevented the trial court from fairly evaluating the best interests of Children. Mother's Brief at 34-35.

Section 2511(b) states:

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b)

We have stated:

[b]efore granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the **intangible** dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of the relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and

- 16 -

welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citation omitted) (emphasis in original). The trial court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

A parent's abuse and neglect are likewise a relevant part of an analysis under Section 2511(b):

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (citations and quotation marks omitted).

Here, in addressing Section 2511(b), the trial court concluded that it was in Children's best interests to terminate Mother's parental rights. The trial court considered testimony that, except for S.L.C., Children wanted to return to Mother. Trial Ct. Op., 7/12/19, at 6. However, the trial court noted

- 17 -

that Mother never inquired about Children's schooling or medical needs and that Foster Mother met their daily, physical, emotional, and medical needs, while acting as their parent figure. ***Id.*** The trial court concluded that a child-parent bond existed between Foster Mother and Children. ***Id.*** at 7. Moreover, the trial court concluded that the termination of Mother's parental rights would not detrimentally impact Children. ***Id.***

A review of the record reveals that Ms. Rosario, the CUA case aide who facilitated visits between Mother and Children, testified that Mother was consistent with her visits. N.T., 3/25/19, at 47-50. Ms. Rosario testified that the visits were successful, noting that Mother brought food and the family sat together to eat and talk before playing together. ***Id.*** at 50. When visits ended, S.L.C. did not have a problem leaving. ***Id.*** at 52. In contrast, H.M.M. became upset at one or two visits, A.G.I. did not want to leave Mother and prolonged visits as much as he could, and Au.G.I. became distraught and, on occasion, needed to be pried from Mother's hands.[9] ***Id.*** at 52-54. Based on the visits, Ms. Rosario testified that she believed Children love Mother. ***Id.*** at 61.

However, Ms. Rosario noted that Mother talked to Children about coming home during several visits, telling Children what their rooms would look like. ***Id.*** at 50-51, 59-60. Mother also promised Children bikes and a Disney World

---

[9] Consistent with Ms. Rosario's observations, counsel for Children testified that he met with Children on two occasions, and H.M.M., A.G.I., and Au.G.I. expressed a desire to return to Mother's care. N.T., 3/25/19, at 110. S.L.C. preferred to be adopted. ***Id.***

trip when they returned home. *Id.* at 50-51, 59-60. Ms. Rosario believed these discussions impacted Children's desire to live with Mother. *Id.* at 59-60.

Foster Mother testified that she currently cares for Children, as well as their two siblings, and is willing to adopt Children. *Id.* at 100, 103. Foster Mother noted that when Children first came to live with her, they had head lice and needed to be taught how to clean themselves. *Id.* at 101-02. Further, Children had educational issues, including S.L.C. who, although in second grade, could not read. *Id.* Moreover, Children expressed that they lived in fear with Mother and worried about food and shelter. *Id.* at 107. Based on her interactions with Children, Foster Mother believed that Children share a friend bond rather than a parental bond with Mother. *Id.* at 108-09.

Additionally, Ms. Parker observed Children in Foster Mother's home and testified that Children interact well with Foster Mother, who takes care of their daily, educational, medical, and dental needs. *Id.* at 88-89. Ms. Parker opined that it was in Children's best interests to be adopted by and remain together with Foster Mother. *Id.* at 91.

In light of the foregoing evidence, we conclude that the record supports the trial court's conclusion that the termination of Mother's parental rights would best serve the needs and welfare of Children pursuant to Section 2511(b). Contrary to Mother's argument, the trial court did not credit and then disregard Ms. Rosario's testimony. Instead, Ms. Rosario testified that Mother shared a good relationship with Children, but also testified that

Mother's promises of gifts and travel may have influenced Children's preferences. Further, while there was testimony that a bond existed between Children and Mother, there was also testimony that the bond was not a parental bond and that it was in Children's best interests to sever the bond so that they can achieve the permanence and stability to which they are entitled. *See In re Adoption of C.D.R.*, 111 A.3d 1212, 1220 (Pa. Super. 2015) ("Clearly, it would not be in [the child's] best interest for his life to remain on hold indefinitely in hopes that Mother will one day be able to act as his parent." (citation omitted)).

To the extent Mother challenges DHS's failure to reevaluate Maternal Grandmother's home, Ms. Parker noted that Mother located a potential home of her own in January 2019. N.T., 3/25/19, at 76. When Ms. Parker evaluated the home, Mother had no furniture and the landlord was still making repairs. *Id.* at 76-77. Ultimately, Mother did not move into that home. *Id.* at 76. Ms. Parker testified that Mother resided with Maternal Grandmother at the time of the hearing. *Id.* at 75. Ms. Parker did not believe the Maternal Grandmother's home was appropriate because it was not large enough for all of the children. *Id.* at 93. Although Mother asked Ms. Parker to re-inspect the Maternal Grandmother's house a second time the Saturday prior to the termination hearing, Ms. Parker did not do so because of Children's lengthy time in care and the short time before the termination hearing. *Id.* at 95-97.

Following our review, we discern no merit to Mother's assertion that Ms. Parker's refusal to reevaluate Maternal Grandmother's home prevented the

trial court from fairly considering Children's best interests. As discussed above, the trial court relied on Dr. Russell's testimony that Mother lacked appropriate insight into the reasons Children were in care. Moreover, while Children had a bond with Mother, the trial court concluded that severing the bond with Mother was necessary to achieve permanency and stability for Children. Accordingly, the trial court did not err in terminating Mother's parental rights to Children pursuant to Section 2511(b). *See T.S.M.*, 71 A.3d at 267.

In her third issue, Mother asserts that the trial court erred in changing Children's permanent placement goals to adoption. Although Mother faults the trial court's decision to change Children's permanency goals to adoption in both her Rule 1925(b) statements and her statement of the questions involved, Mother fails to develop an adequate argument regarding the goal change orders. *See* Mother's Brief at 24-35. Rather, Mother, with respect to her argument pertaining to the trial court's findings pursuant to Section 2511(b), argues, "Ms. Parker's admitted refusal to evaluate Mother's housing shortly before the hearing should prevent any Court from fairly evaluating whether Goal Change/Termination was in the best interests of the Children." *Id.* at 34. Accordingly, Mother waived any challenge to the goal change by failing to develop an argument in her brief supported by citation to relevant legal authority. *In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017) ("It is well-settled that this Court will not review a claim unless it is developed in

the argument section of an appellant's brief, and supported by citations to relevant authority." (citation omitted)).

However, even if Mother preserved her issue regarding the goal change orders, it would be meritless. The Juvenile Act governs proceedings to change a child's permanent placement goal. *See* 42 Pa.C.S. §§ 6301-6375. Courts must apply the following analysis when considering a goal change:

> Pursuant to [42 Pa.C.S.] § 6351(f) of the Juvenile Act, . . . the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted). This Court reviews a goal change order for an abuse of discretion. *In Interest of: T.J.J.M.*, 190 A.3d 618, 623 (Pa. Super. 2018).

Although the trial court did not specifically address this issue in its opinion, at the conclusion of the hearing, the trial court stated on the record that it believed it was in Children's best interests to change their permanency goals to adoption. N.T., 3/25/19, at 138-39. The trial court concluded that Mother lacks the capacity to parent and that Foster Mother is more likely to

- 22 -

maintain a loving, stable, and consistent relationship with Children. *Id.* at 138-40.

Instantly, at the time of the proceedings, Children had been in foster care for more than two years, and Mother failed to demonstrate an ability to parent Children during their time in care. Instead, Children and their siblings reside in a foster home together where their Foster Mother provides exceptional care. Meanwhile, it is clear that Mother will not be in a position to provide Children with safety and permanency at any point in the foreseeable future. Therefore, we discern no abuse of discretion by the trial court in changing Children's permanent placement goals from reunification to adoption. *See T.J.J.M.*, 190 A.3d at 623.

Accordingly, we affirm the decrees involuntarily terminating Mother's parental rights and the orders changing Children's permanent placement goals to adoption.

Decrees and orders affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/4/19